IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

Nos. 08-74725, 08-74811, 08-74900, 08-75008, 08-75091, 08-75098,
08-75099, 08-75112, 08-75113, 08-75130, 08-75132, 08-75133,
08-75161, 08-75165

_____

THE ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, *ET AL.,*

Petitioners,

v.

BONNEVILLE POWER ADMINISTRATION,

Respondent.

_____

**BRIEF OF INTERVENOR-RESPONDENTS WESTERN PUBLIC
AGENCIES GROUP, PUBLIC UTILITY DISTRICT NO. 1 OF
COWLITZ COUNTY, PUBLIC POWER COUNCIL, THE CITY OF
SEATTLE, NORTHWEST REQUIREMENTS UTILITIES, PUBLIC
UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, AND
TILLAMOOK PEOPLE'S UTILITY DISTRICT**

_____

Terence L. Mundorf
Marsh Mundorf Pratt
Sullivan + McKenzie
16504 9th Avenue SE,
Suite 203
Mill Creek, WA 98012
Tel: 425-742-4545

Mark R. Thompson
Public Power Council
825 NE Multnomah
Street, Suite 1225
Portland, OR 97232
Tel: 503-595-9779

Paul M. Murphy
James L. Buchal
Murphy & Buchal LLP
2000 SW First Avenue
Portland, OR 97201
Tel: 503-227-1011

Additional Counsel Listed on Back of Cover

February 25, 2010

Joel C. Merkel
1001 4th Avenue,
Suite 4050
Seattle, WA 98154
Tel: 206-389-8222

Richard G. Lorenz
Thomas M. Grim
Cable Huston Benedict
Haagensen & Lloyd
1001 Fifth Avenue,
Suite 2000
Portland, OR 97204
Tel: 503-224-3092

Anne L. Spangler
Eric L. Christensen
Jeffrey R. Kallstrom
Public Utility District
No.1 of Snohomish
County
2320 California Street
Everett, WA 98206
Tel: 425-783-8649

Engel E. Lee
Director, Utilities Section
Seattle City Attorney's Office
Seattle City Hall
600 Fourth Avenue, Fourth Floor
P.O. Box 94769
Seattle, WA 98124
Tel: 206-233-2157

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Intervenor-Respondents provide the following information:

1. Public Utility District No. 1 of Cowlitz County, Washington is a government public utility organized under the laws of the State of Washington, and has no parent corporation and is not owned in whole or part by any publicly held corporation;

2. Public Power Council is a non-profit corporation, duly incorporated and organized under the laws of the State of Washington, with its principal office in Portland, Oregon. Public Power Council has no stock and no parent corporation;

3. Northwest Requirements Utilities is a non-profit corporation organized under the laws of the state of Oregon to represent the interests of its 50 public preference utility members. Neither NRU nor its members have parent corporations or stock;

4. Alder Mutual Light Company; Benton Rural Electric Association; the cities of Ellensburg and Port Angeles, and the towns of Eatonville, Milton and Steilacoom, Washington; Elmhurst Mutual Power and Light Company; Lakeview Light and Power Company; Ohop Mutual Light Company; Parkland Light and Water Company; Peninsula Light Company; the Public Utility Districts Nos. 1 of

Clallam, Clark, Grays Harbor, Kittitas, Lewis, Mason, Skamania and Wahkiakum Counties, Washington; the Public Utility District No. 2 of Pacific County and Public Utility District No. 3 of Mason County, Washington (together, the Western Public Agencies Group) is each a government public utility organized under the laws of the State of Washington, and has no parent corporation and is not owned in whole or part by any publicly held corporation;

5.     Public Utility District No.1 of Snohomish County, Washington, is a government public utility organized under the laws of the State of Washington, and has no parent corporation and is not owned in whole or part by any publicly held corporation;

6.     The City of Seattle is a municipal corporation organized under the laws of the State of Washington, and has no parent corporation and is not owned in whole or part by any publicly held corporation; and

7.     Tillamook People's Utility District is a government public utility organized under the laws of the State of Oregon, and has no parent corporation and is not owned in whole or part by any publicly held corporation.

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................... 1

SUPPLEMENTAL STATEMENT OF THE CASE .............................. 2-8

ARGUMENT ...................................................................................... 8-26

I.  THE BENEFITS PROVIDED TO THE IOUs
    UNDER THE REP SETTLEMENT AS POWER
    MUST BE COUNTED IN THE MEASURE OF
    EXCESS REP BENEFITS TO DETERMINE
    EACH IOU's REFUND OBLIGATION .................................... 8-18

    A.  The REP Settlement Power Sales Were an
        Integral Part of the REP Settlement Benefit
        Transfer and Were Neither Independently
        Lawful Power Sales Nor Separable From the
        REP Settlement Agreements ................................................. 9-14

    B.  The Power Sales Benefits That Later Became the
        Subject of the Load Reduction Agreements Must
        Be Included in the Lookback Analysis ............................... 14-18

II.  BPA's DECISION TO ADDRESS THE ERRORS
     FOUND BY THIS COURT IN PGE AND GNA
     DOES NOT VIOLATE ANY RULE AGAINST
     RETROACTIVE RULEMAKING ............................................ 18-22

III. THE OPUC's ARGUMENT THAT BPA DID NOT
     CONSIDER EQUITIES IN THE LOOKBACK
     ANALYSIS IS ERRONEOUS ................................................. 22-24

IV.  ADOPTION OF ARGUMENTS ON OTHER ISSUES ............ 24-26

CONCLUSION ................................................................................... 26-27

i

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                     <u>Page</u>

*Atlantic Richfield Co. v. Bonneville Power Admin.,* 818 F.2d
701 (9th Cir. 1987)................................................................................  20

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204 (1988).......................  19-21

*Consolidated Edison Co. v. FERC,* 347 F.3d 964 (D.C. Cir. 2003)........  19

*Consumer Federation of Am. v. Federal Power Comm.,* 515 F.2d
347 (D.C. Cir. 1975) ............................................................................  24

*FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145 (1962).............  18-19

*Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.,*
501 F.3d 1037 (9th Cir. 2007) .............................................................  2, 4, 13-
14, 17-18
20, 22, 26

*Indiana & Michigan Elec. Co. v. FPC,* 502 F.2d 336
(D.C. Cir. 1974) ...................................................................................  19

*Newman v. Apfel,* 223 F.3d 937 (9th Cir. 2000) ...................................  19

*Northwest Envtl. Def. Ctr. v. BPA,* 477 F.3d 668 (9th Cir. 2006)...........  10

*Oregon Pub. Util. Comm'r v. Bonneville Power Admin.,* 767 F.2d
622 (9th Cir. 1985)...............................................................................  19-20

*Pac. Northwest Generating Coop. v. Bonneville Power Admin.,* 580
F.3d 792 (9th Cir. 2009) .......................................................................  13

*Portland General Electric Co. v. Bonneville Power Admin.,*
501 F.3d 1009 (9th Cir. 2007) .............................................................  2-4, 10-14
18, 20, 22
26

*Pub. Util. Comm. of State of Cal. v. FERC,* 814 F.2d 560
(9th Cir. 1987)......................................................................................  19

ii

*SEC v. Chenery,* 332 U.S. 194 (1947) ......................................................... 23

*United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223 (1965) ................................................................................................ 18

Statutes

16 U.S.C. § 839c(b) .................................................................................... 9

16 U.S.C. § 839c(c)..................................................................................... 2

16 U.S.C. § 839e(b) .................................................................................... 3

iii

**INTRODUCTION**

This Intervenor-Respondent Brief is filed on behalf of the Western Public Agencies Group ("WPAG"); the Public Power Council ("PPC"); Public Utility District No. 1 of Cowlitz County, Washington; Northwest Requirements Utilities; Public Utility District No.1 of Snohomish County, Washington; Tillamook People's Utility District, Oregon; and the City of Seattle (jointly "Preference Customers").

The Bonneville Power Administration ("BPA") filed its Answering Brief of Respondent on December 22, 2009, and subsequently filed a revised Answering Brief of Respondent ("BPA Answering Brief") in compliance with an order of this Court.[1] The BPA Answering Brief responded to arguments advanced in briefs filed by Petitioners, including certain investor owned utilities ("IOUs"),[2] the Idaho Public Utilities Commission ("IPUC"), and Oregon Public Utility Commission ("OPUC").

In this brief, the Preference Customers will address certain issues raised by the IOUs, the IPUC and the OPUC, which were either inadequately addressed, or not addressed at all, in the BPA Answering Brief.

---

[1] Appellate Commissioner's Order, dated January 13, 2010, Docket Entry No. 110. All references in this brief to the BPA Answering Brief will be to the one filed on January 25, 2010, in response to this order.

[2] IOUs are comprised of Avista Corporation, Idaho Power Company, PacifiCorp, Portland General Electric Company and Puget Sound Energy, Inc.

## SUPPLEMENTAL STATEMENT OF THE CASE

In the interest of brevity, this supplemental statement focuses on only those matters which are addressed in this brief.

This proceeding addresses the decisions made by BPA in the WP-07 Supplemental rate proceeding ("WP-07S"), which was conducted in response to this Court's decisions in *Portland General Electric Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007) ("*PGE*"), and *Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.,* 501 F.3d 1037 (9th Cir. 2007) ("*GNA*").

In the *PGE* decision, this Court determined that certain Residential Exchange Program Settlement Agreements ("REP Settlements") were unlawful as beyond BPA's statutory authority. 501 F.3d at 1037. The REP Settlement provided the IOUs benefits in the form of monetary payments, and actual power sales to the IOUs at a Residential Load ("RL") rate. *PGE* held that both the monetary and the power benefits provided to the IOUs under the REP Settlements were not a valid exercise of BPA's authority under § 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act ("NWPA"). 16 U.S.C. § 839c(c).

The Court also found that the benefits provided to the IOUs under the REP Settlement were far in excess of the amounts that BPA could provide to

2

the IOUs under the § 5(c) residential exchange program ("REP"), and also exceeded the amounts it could lawfully charge its preference customers under the limits contained in § 7(b)(2). 16 U.S.C. § 839e(b); 501 F.3d at 1021-1022. As succinctly summarized by BPA, "under the REP Settlement Agreements the sale of physical power was not distinct from the payment of monetary benefits. Instead, it was one portion of the REP benefits that BPA paid without legal authority." (BPA *IPUC* Answering Br. at 78.)[3] The RL rate was set at the same level as the preference customer rate, and was used in conjunction with the power sales component of the REP Settlements to transfer benefits to the IOUs. 501 F.3d at 1022. This Court recognized in *PGE* that a major portion of the excessive benefits transferred to the IOUs under the REP Settlements was accomplished by the use of the RL rate. *Id.* BPA has acknowledged that the REP Settlement power sales were an integral part of the benefit transfer to the IOUs invalidated by this Court. "In PGE, this Court invalidated the REP Settlement Agreements in their entirety, including the power sales component of the Agreements." (BPA Answering Br. at 40.)

---

[3] "BPA *IPUC* Answering Br." references the Answering Brief filed by BPA on December 22, 2009, in *Idaho Pub. Util. Comm. v. BPA,* Consolidated Case Nos. 08-74927, *etc* ("*IPUC*").

In *GNA,* the companion case to *PGE*, this Court determined that BPA could not treat the costs of the REP Settlements as costs incurred in the ordinary course of business, but must treat such costs as subject to the limitations of the § 7(b)(2) rate ceiling test. *GNA* held that by including the costs of the monetary payments and power sales under the REP Settlements in setting rates in the WP-02 rate proceeding without regard to the § 7(b)(2) rate ceiling test, BPA had "unlawfully burdened its preference customer rates with part of the cost of the REP settlement." 501 F.3d at 1048. This Court remanded the matter to BPA to "set rates in accordance with this opinion." *Id.* at 1053.

As summarized by BPA, its task upon remand under the *PGE* and *GNA* decisions was to provide "remedial relief for overcharges during the FY 2002-2006 period . . . by rectifying what the Court described as a 'plain violation' of statutory requirements." (BPA Answering Br. at 47.) (citations omitted) To do so, BPA had to determine the amount of the overcharges borne by preference customers as a result of paying BPA's unlawful rate.

After the initial conclusion of the WP-02 rate proceeding, and while the petitions that resulted in the *PGE* decision were pending before this Court, BPA realized that its planned reliance on power market purchases to fulfill its power supply commitments to the IOUs under the REP

4

Settlements, in combination with its other power supply obligations, would cause BPA serious financial difficulties. The combination of poor water conditions in the Northwest and the total breakdown of the market de-regulation experiment in California resulted in unprecedented market prices. BPA estimated that continued reliance on market power purchases would result in an estimated 250% rate increase to its preference customers. *Id*. at 25. Said another way, at this juncture BPA was so uncertain regarding its revenues and costs that it was estimating that only about one-third of its estimated costs would be covered by revenues from its base rates.

In response to this situation, BPA did two things. First, it reopened the WP-02 rate proceeding and instituted three cost recovery adjustment clauses ("CRACs"). While the details of each of these CRACs varied, they shared a common purpose: to allow BPA to adjust its rates frequently (in some cases every six months) to reflect in its rates the actual loads served and the actual power costs incurred. *Id*. at 22-23. The use of these CRACs was at least a partial acknowledgement by BPA that it had no clear picture of the costs it would incur to fulfill the power delivery commitments it had made to the IOUs in the REP Settlements.

The second step BPA took was to make a request to all its customers to relieve BPA of some portion of its power delivery commitment to them,

5

in order to reduce BPA's reliance on the power market. All three of BPA's customer classes (preference customers, the IOUs, and the direct service industries) responded with some amount of reduction of their power demands placed on BPA. *Id.* at 21-23.

Each of the IOUs agreed to convert some or all of the REP Settlement benefits they would have received as power deliveries into cash payments. Some did so by amending their REP Settlements, others by signing letter agreements. In the case of PacifiCorp, the REP Settlement power benefits were monetized with a letter amendment to the REP Settlement, and a separate document laying out the payments to be made by BPA in lieu of the REP Settlement power. Puget Sound Energy ("PSE") amended its REP Settlement to monetize its REP Settlement power benefits (the PacifiCorp and PSE agreements together, "LRAs"). *Id.* at 27.

In the WP-07S proceeding, BPA set about determining the amount of the overcharges unlawfully imposed on its preference customers during the FY 2002-2008 period. To do so, BPA calculated the benefits each IOU would have received if it had selected the statutory REP (although none had done so when offered). These "reconstructed" REP benefits represent BPA's determination of the maximum benefits BPA could lawfully have provided to the IOUs under §§ 5(c) and 7(b) of the NWPA. BPA compared

6

these reconstructed REP benefits with the benefits (whether in the form of money or power) it had provided to each IOU under the unlawful REP Settlements. BPA referred to this study and comparison as the Lookback Analysis. (BPA Answering Br. at 34-36.)

With an exception addressed below, BPA determined that each IOU would be required to refund the amount by which its actual REP settlement benefits exceeded its reconstructed REP benefits. BPA called this refund obligation the "Lookback Amount". (BPA Answering Br. at 35.)

When determining the size of the Lookback Amount each IOU had to repay, BPA used two different approaches. For Avista, Idaho Power, Northwestern and Portland General Electric ("PGE"), BPA included in the Lookback Amount all monetary and power benefits. *Id*. at 77. With PacifiCorp and PSE, however, BPA took a different approach. Rather than including all of the power benefits, as valued by the LRA monetization payments, in their Lookback Amounts, BPA allowed PacifiCorp and PSE to retain the greater of the payments they received to monetize the REP Settlement power benefits under the LRAs or their reconstructed REP benefits. *Id.* at 78. This approach had the effect of allowing PacifiCorp and PSE to keep their reconstructed REP benefits plus a portion of the power benefits sold back to BPA under the LRAs; that is, PacifiCorp and PSE

7

together were allowed to retain $650 million in REP Settlement benefits in excess of the maximum amount BPA calculated they could have received under the lawful REP.[4]  *Id.* at 79.

### ARGUMENT

**I.    THE BENEFITS PROVIDED TO THE IOUs UNDER THE REP SETTLEMENT AS POWER MUST BE COUNTED IN THE MEASURE OF EXCESS REP BENEFITS TO DETERMINE EACH IOU's REFUND OBLIGATION.**

The IOUs argue that BPA erred by failing to *exclude* from the Lookback Analysis the entire amount of the benefits they received under REP Settlement Agreement in the form of low-priced power, whether it was received in the form of actual power or payments to monetize the value of that power.  (Joint IOU Br. at 37-51.)  In essence, the IOUs assert that they are entitled to retain their full reconstructed benefits under a lawful REP, and *in addition* all of the power and payments made to them to monetize the REP Settlement power benefits.

The IOUs offer two arguments in support of this position.  First, they argue that no portion of the benefits provided to them as REP Settlement power should be repaid because the IOUs claim those power sales were

---

[4] The Preference Customers believe that BPA committed legal error by permitting PacifiCorp and PSE to retain any portion of the LRA payments in excess of their reconstructed benefits, which legal error is explained in their opening briefs, and will be further explained in response to BPA's Answering Brief.

independently supported by § 5(b) of the NWPA, and therefore should not have been reflected in BPA's Lookback Analysis. 16 U.S.C. § 839c(b); *Id.* at 42. Second, the IOUs assert that the excess value conferred on them by the REP Settlement power benefits became immune from repayment when that value was locked in (monetized) under the LRAs. *Id.* at 49-51.

Neither argument withstands legal scrutiny. Nor do they justify preference customers bearing the cost of any REP benefits in excess of those permitted by law, whether such excess benefits were provided in the form of cash payments, low-priced power, or payments to monetize the below market value of such power. This Court held as much in *PGE* and *GNA*.

**A.** **The REP Settlement Power Sales Were an Integral Part of the REP Settlement Benefit Transfer and Were Neither Independently Lawful Power Sales Nor Separable From the REP Settlement Agreements.**

The IOUs argue that the value of the benefits provided to them through the power sales under the REP Settlement should not be part of the Lookback Amount because "section 5(b) [of the Northwest Power Act] expressly authorizes power sales to the IOUs." (Joint IOU Br. at 43.) In other words, they characterize the REP Settlement power sales as validly resting upon BPA's statutory authorities under § 5(b), and not under the REP authorized under § 5(c). In making this argument, the IOUs ask the Court to close its eyes to the facts and to ascribe BPA's past actions to authorities that

9

even BPA agrees it did not exercise. The IOUs also ignore settled administrative law that a court may not uphold an administrative action on grounds different from those offered by the agency itself. *See, e.g., Northwest Envtl. Def. Ctr. v. BPA*, 477 F.3d 668, 686 (9th Cir. 2006).

The purpose of the REP Settlement was to effectuate a transfer of benefits from BPA to the IOUs in two ways: cash payments and the sale of power at below-market rates. The benefit transfer under the power sales was accomplished by selling the power to the IOUs at the RL rate, which was set at a level equal to the preference customer rate. 501 F.3d at 1021-1022.

The power sales commitment contained in the REP Settlement was as much a part of the benefit transfer as were the cash payments. BPA concurs in this assessment, stating that, "the Firm Power Sales were made at the low-cost RL rate, rather than the New Resources ("NR") rate that would apply to sales to IOUs under section 5(b), to "support [] the proposed value of the settlement of the REP with regional IOUs." (BPA Answering Br. at 69.)

BPA's conclusion is substantiated by the huge difference between the RL rate used for the power sales under the REP Settlement and the NR rate, which BPA is statutorily required to use for sales to IOUs under § 5(b). During the relevant period, the NR rate was nearly three times higher than the comparable PF rate that was used to set the RL rate. *See*, R.A.R.

10

108891-92 (showing monthly NR rate of up to 60 mills/kWh); R.A.R. 108856-58 (showing monthly PF rate averaging around 20 mills/kWh). Using the RL rate for the REP Settlement power sales had only one purpose – to transfer valuable benefits to the IOUs. Using the much more expensive NR rate required for power sales to IOUs under § 5(b) would have defeated the benefit transfer purpose that these power deliveries under the REP Settlements were intended to accomplish. That is precisely why these sales were made part of the REP Settlements and not as stand alone sales.

This Court concluded in *PGE* that these power sales were an integral part of the benefit transfer under the REP Settlement, and were undertaken for the sole purpose of providing to the IOUs benefits not permitted under §§ 5(c) and 7(b) of the NWPA. As this Court stated:

> In addition to the cash payments, BPA also included "net requirement power sales" at fixed rates to the IOUs as a component of the 2000 REP Settlement Agreements. In the *2000 REP Settlement Agreement ROD*, BPA acknowledged that the combined value of the settlement agreements' required sales and cash payments exceeded by nearly three times its own estimate (in the WP-02 Rate Case) of the total expected REP Obligations for the settlement period.

501 F.3d at 1022.

The REP Settlement power sales were part and parcel of the benefits BPA hoped to provide to the IOUs, and served no other purpose. This

11

unremarkable conclusion is also supported by the manner in which BPA distributed benefits under the REP Settlement, as compared to the statutory REP. As observed by this Court in *PGE*, "whereas the WP-02 proceeding concluded that effectively two IOUs were eligible for the REP benefit * * * BPA concluded that seven IOUs would be eligible for the REP settlement." *Id.* at 1033-1034. The Court properly concluded that the only purpose to be served by this greatly increased eligibility for REP Settlement benefits, as compared to the statutory REP, was to confer benefits on the IOUs in a manner and in amounts favored by BPA, as opposed to those allowed under the NWPA. *Id.* at 1036-1037.

BPA now concurs that the power sales were simply a mechanism for transferring benefits under the REP Settlement. "Firm Power Sales were not section 5(b) sales, separate and independent from the REP Settlement Agreements; the Firm Power Sales were simply another means of providing the IOUs with REP settlement benefits. They were offered only as a part of the REP Settlement Agreements." (BPA Answering Br. at 68-69.) There can simply be no serious question that the REP Settlement power sales were solely intended to accomplish a benefit transfer to the IOUs, and were not in any manner a legitimate sale of power under § 5(b).

12

Lastly, the IOU effort to rename the REP Settlement power sales as § 5(b) transactions flies in the face of the recent holding of this Court in *Pac. Northwest Generating Coop. v. Bonneville Power Admin.*, 580 F.3d 792, 823 (9th Cir. 2009). In that case, this Court held that BPA cannot expand its authority through the use of "creative nomenclature" and that a contract to sell power to BPA's direct service industrial customers at a rate lower than the statutorily authorized rate, and lower than the price available on the market, was invalid. Had BPA attempted to justify the power sales in the REP Settlements as stand-alone 5(b) sales, BPA's use of the RL rate for such sales would have rendered them invalid.

In short, in *PGE* this Court reviewed the REP Settlement Agreements, including the power sales at the RL rate, and concluded that the entire benefit package rested on BPA's authority under § 5(c). 501 F.3d at 1037. It found that the benefits provided to the IOUs, including the monetary payments and the power sales, were in excess of those permitted under §§ 5(c) and 7(b). *Id.* The IOUs' attempt to recast the power sales contained in the REP Settlement Agreements as sales under § 5(b) to retain both the REP Settlement power benefits as well as their REP benefits is inconsistent with this Court's decision in *PGE*. All of the transactions in the REP Settlements, power as well as cash, were found to be grounded in, and

13

constrained by, §§ 5(c) and 7(b). There is simply no merit to the IOUs' argument that the power sale component of the REP Settlements was or could be justified as a lawful 5(b) sale, or that the value of those power benefits should be ignored in BPA's Lookback Analysis.[5]

### B. The Power Sales Benefits That Later Became the Subject of the Load Reduction Agreements Must Be Included in the Lookback Analysis.

In 2001, PacifiCorp and PSE entered into Load Reduction Agreements ("LRAs") wherein they agreed to sell substantial amounts of power they were to receive under the REP Settlement Agreements back to BPA. As demonstrated above, the power sales components of the REP Settlements were intended to and did transfer REP benefits to the IOUs that were far in excess of the benefits allowed under the NWPA. Therefore, it is necessary to quantify the dollar value of those power benefits, and their cost to BPA, in order for BPA to determine how much must be returned to the preference customers so that the *GNA* mandate can be satisfied.

---

[5] The IOUs also argue that that the RL sales did not increase the costs recovered in the preference customers' rates and the RL rate was a cost based rate. The first point has already been addressed and resolved in *PGE*; the sales substantially increased the REP costs unlawfully imposed on preference customers. 501 F.3d at 1033-1034. The second point is irrelevant because the costs allegedly recovered by the RL rate were much less than the costs that the NWPA requires be recovered from 5(b) sales to IOUs.

The fact that PacifiCorp and PSE sold the power back to BPA rather than to some other party is simply irrelevant to this requirement. The power conveyed in the REP Settlements could have been used by the IOUs to meet their own retail load, and thus avoid the need to acquire the power on the open market; it could have been sold by the IOUs to other utilities; it could have been sold back (or "monetized") to BPA for cash; or any combination of these. Irrespective of how the IOUs disposed of the power, the point is the REP Settlement power benefits had significant value to the IOUs, and significant cost to BPA, as BPA recognized in its Lookback Analysis. For purposes of the Lookback Analysis, the relevant issue is the quantification of the cost and value of those power benefits. The fact that BPA repurchased the power benefits is significant only because that repurchase assures that the cost to BPA and the value to the IOUs of the power benefits were identical.

The fact that PacifiCorp and PSE sold their power benefits back to BPA under the LRAs cannot mean that those power benefits had no value or cost, as would be the necessary implication of the position advocated by the IOUs. Indeed, the amount BPA had to pay the IOUs under the LRAs to induce them to forego the benefits of the power received under the REP Settlement Agreements – $412 million to PacifiCorp and $607 million to

15

PSE (R.A.R. 087529) – demonstrates that the value and the cost of this power exceeded $1 billion.

The IOUs in effect claim this value should be ignored in the Lookback Analysis because the LRAs were not directly challenged in this Court. But that has no bearing on whether it is proper for BPA to include the value of the power benefits BPA conveyed to PacifiCorp and PSE under the unlawful REP Settlements in its quantification of benefits in the Lookback Analysis. BPA's inclusion of the value of those benefits is appropriate so long as PacifiCorp and PSE received the value, and BPA paid the costs, of these extra-statutory benefits. Any other conclusion would require BPA to ignore the $1.019 billion of net value of the REP Settlement power benefits. This amount, established in the LRAs, is the actual cost to BPA and value to PacifiCorp and PSE of the power benefits transferred to them under the REP Settlements. The arguments of the IOUs, that BPA must turn a blind eye towards the transfer of $1.019 billion in furtherance of unlawful agreements, has no merit.[6]

---

[6] For power that BPA actually delivered to the IOUs pursuant to the REP Settlements, such as to PGE, BPA quantified the value of those power benefits as the difference between the market price for power and the RL rate at the time of the delivery. BPA could have used a similar calculation to quantify the value of the REP Settlement power benefits it conveyed to PacifiCorp and PSE. However, the LRA payment provides a more accurate measure.

BPA contends that the LRAs themselves provided BPA great financial relief, because the LRAs provided PacifiCorp and PSE less value than the difference between the market price and RL price of the power. (BPA Answering Br. at 26-27)  Even if true, this argument is irrelevant because the question posed by the *GNA* remand is not whether the LRAs reduced BPA's burdens, but whether the benefits conferred by BPA on the IOUs exceeded the rate cap in Section 7(b)(2) of the NWPA.  While BPA might properly consider whether the LRAs increased or reduced the value of the REP benefits improperly donated to the IOUs, it cannot simply ignore the value of the power benefits provided to the IOUs through the REP Settlements.  The LRA payments represent the arms-length value the parties themselves attached to the REP Settlement power benefits BPA unlawfully conveyed to PacifiCorp and PSE.[7]

The IOUs also argue that the scope of the remand cannot reflect the payments made under the LRAs.  This has no merit.  (Joint IOU Br. at 49-51.)  The *GNA* decision held that by including the costs of the REP Settlement in preference customer rates, BPA was guilty of "burdening its preference customers with part of the cost of the REP settlement",  and by so

---

[7] It was unlawful for BPA to have allowed PacifiCorp and PSE to retain the higher of their LRA payments or their lawful benefits.  That issue was addressed in the Preference Customers' Opening Brief and will be addressed further in the Preference Customers' Reply Brief.

17

doing BPA had "'ignored its obligations' under section 7(b)(2) and (3)". 501 F.3d at 1048 (*citing PGE*, 501 F.3d at 1036). The scope of the remand in the *GNA* decision was for "BPA to set rates in accordance with [the Court's] opinion." 501 F.3d at 1053. As demonstrated above, that included a need for BPA to determine the amount of excess benefits, whether in cash or power or both, the IOUs received under the REP Settlements, and the costs of such excess benefits illegally charged to BPA's preference customers.

In short, using the LRA payments as the proper measure of the cost and value of the power benefits BPA unlawfully conveyed to PacifiCorp and PSE is appropriate whether or not the LRAs, viewed in isolation, were lawful contracts or whether they were directly challenged.

## II.  BPA's DECISION TO ADDRESS THE ERRORS FOUND BY THIS COURT IN *PGE* AND *GNA* DOES NOT VIOLATE ANY RULE AGAINST RETROACTIVE RULEMAKING

It has long been established that an administrative agency may "undo what [was] wrongfully done by virtue of [a prior] order." *United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 229 (1965). And it is the "duty" of the agency, "where refunds are found due, to direct their payment at the earliest possible moment consistent with due process." *Id.* at 230 (*quoting FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 155

(1962)). *See also, Consolidated Edison Co. v. FERC,* 347 F.3d 964, 972 (D.C. Cir. 2003) (agency must ordinarily provide full refunds).

Relying primarily on the Supreme Court's decision in *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988), IPUC and OPUC (collectively, the "PUCs") urge the Court to reject BPA's attempt to undo what was wrongfully done in its prior orders, asserting that BPA's actions violate the rule against retroactive ratemaking. But the Courts have long recognized that agencies may correct the errors created by their prior orders without violating the rule against retroactive rulemaking. *See, e.g., Newman v. Apfel*, 223 F.3d 937, 942 (9th Cir. 2000); *Indiana & Michigan Elec. Co. v. FPC*, 502 F.2d 336, 339 n.8 (D.C. Cir. 1974) (refunds in response to a remand do not violate rule against retroactive ratemaking).

In fact, this Court has expressly held in multiple cases that legal errors in BPA rate determinations can and should result in retroactive refunds of amounts paid by the injured parties. *See, e.g., Pub. Util. Comm. of State of Cal. v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987) (explaining that petitioners challenging a BPA rate are "fully protected" from harm they may experience during the pendency of FERC review because if the adopted rate proves unlawful, the court has the ability to "provide retroactive refunds if necessary"). *See also, Oregon Pub. Util. Comm'r v. Bonneville Power*

19

*Admin.*, 767 F.2d 622, 630 (9th Cir. 1985) and *Atlantic Richfield Co. v Bonneville Power Admin.*, 818 F.2d 701, 705 (9th Cir. 1987) (both recognizing the right of parties to receive refunds of unlawful BPA rate collections).[8] It is far too late in the day to contend that a party injured by BPA rates adopted pursuant to erroneous interpretation of applicable law has no avenue for relief from the harms imposed by the unlawful rate.

The PUCs attempt to rewrite this settled law, asserting that *Bowen* allows BPA to correct the errors identified by the Court in *PGE* and *GNA* on a forward-going basis only, leaving the petitioners who prevailed in those cases with no remedy for the harm they suffered prior to the Court's ruling.

The PUCs misconstrue the rule in *Bowen* and misapply their erroneous construction to BPA's Lookback Analysis. They fail to acknowledge a major distinction between the facts in *Bowen* and the facts in this case. Specifically, in this case the Court is reviewing actions taken by BPA to *address and correct errors of law found by the Court in BPA's prior actions.* BPA took these actions in response to a remand order in *GNA* to conform its earlier erroneous actions to the law. *Bowen*, on the other hand, addressed an agency's attempt to create a rule with retroactive effect to

---

[8] In each case, the ruling that refunds could be retroactively calculated and provided to the injured BPA customers was a holding because the statements all went to the issue of the Court's subject matter jurisdiction.

20

*frustrate* a court's prior decision. *Bowen* held that such a rule was unlawful because the agency did not have retroactive rulemaking authority.

Unlike the cases cited above, *Bowen* did not involve the ability to provide relief to parties injured by an unlawful agency rule. In *Bowen*, an agency had a valid rule on the subject of cost-limits applicable to reimbursements to medical providers under Medicare. 488 U.S. at 206. The agency sought to establish a new rule that excluded certain previously reimbursable costs from reimbursement. *Id*. In establishing this replacement rule, the agency did not provide notice and permit comments as required by the Administrative Procedure Act. Therefore, on review a district court found the new rule invalid and left the prior rule in place, unaltered. *Id*. The agency did not appeal the judicial determination that the new rule was invalid. Instead, the agency created another new rule that replicated the substance of the invalidated rule and applied the new rule retroactively to the effective date of the invalidated rule. In other words, *Bowen* involved an agency's attempt to retroactively impose a rule in order to deny injured parties relief from the harm caused them by a previously invalidated rule.

*Bowen* stands for the proposition that an agency may not adopt new rules to be applied retroactively to replace valid rules unless Congress has granted the agency express authority to adopt such retroactive rules.

However, this principle does not apply to BPA's Lookback Analysis because BPA did not adopt new rules that retroactively replaced a prior valid rule. Because of BPA's errors of law identified in the *PGE* and *GNA* opinions, BPA failed to apply the then applicable laws in the rate determinations that gave rise to the Lookback. In its Lookback Analysis, BPA simply attempted to apply the laws that were in effect during the Lookback period.

The Court should reject the PUCs' erroneous arguments about retroactive rulemaking and should instead apply its own controlling precedent cited above.

## III.  THE OPUC'S ARGUMENT THAT BPA DID NOT CONSIDER EQUITIES IN THE LOOKBACK ANALYSIS IS ERRONEOUS.

The OPUC argues that BPA's effort to restore to preference customers the amounts BPA illegally overcharged them because of the unlawful REP Settlement should be set aside as arbitrary and capricious under the Administrative Procedure Act. (OPUC Br. at 36-39.) The OPUC's primary argument supporting its contention is that BPA failed to "analyze whether the retroactive correction is required or permitted by the public interest." *Id*. at 36. This argument is incorrect and relies on improper readings of the case law.

22

The OPUC asserts that "[u]nder the Supreme Court's opinions in *SEC v. Chenery*, it was incumbent on BPA to determine whether it is appropriate, in view of all the circumstances, to order the reparations contemplated by the Lookback Analysis." (OPUC Br. at 39.) (referring to *SEC v. Chenery*, 332 U.S. 194 (1947)). The OPUC misapplies *SEC v. Chenery*.

In *SEC v. Chenery*, the Court stated that "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *Id*. at 203. However, that statement was made in the context of the Court's description of the latitude afforded agencies to determine whether to use rulemaking or adjudication to establish precedent on issues of first impression. *See, Id*. The discussion of retroactivity was relevant only because the Court recognized that adjudications, as opposed to normal rulemakings, have retroactive effect (because they may prohibit actions that have occurred in the past).

In short, the required "weighing of pros and cons" set out in *Chenery* apply in an agency's decision about whether to establish new precedent through adjudication (which has retroactive effect by definition) or general rulemaking (which normally applies only prospectively) is not applicable to

23

BPA's Lookback Analysis.[9] BPA was not seeking to establish new precedent on an issue of first impression; it was crafting a remedy in response to an order of the Court. *Chenery* is inapposite.

## IV. ADOPTION OF ARGUMENTS ON OTHER ISSUES

Pursuant to this Court's Order dated June 4, 2009,[10] this case will be calendared before the same panel that considers a related set of dockets consolidated as *Idaho Public Utilities Commission v. Bonneville Power Admin.,* Consolidated Docket Nos. 08-74927 *et al.* ("*IPUC*"). That order allowed parties to this case to incorporate by reference portions of briefs filed in the *IPUC* case.

---

[9] The OPUC also quotes *Consumer Federation of Am. v. Federal Power Comm.*, 515 F.2d 347, 359 (D.C. Cir. 1975) to imply that BPA should not have given the Court's order in *GNA* full retroactive effect. (OPUC Br. at 37, n. 85) The statements quoted in that case, however, when read in context, state only that an agency, as opposed to a Court, may be best suited to determine actual refund amounts. The agency may want to consider, for example, whether there were offsets that should be considered. *Consumer Federation of Am.,* 515 F.2d at 359. In the case of BPA's Lookback Analysis, the Court is in fact reviewing the agency's calculation of an appropriate refund amount, and thus the statements quoted by the OPUC are not applicable. It is also noteworthy that the Court in *Consumer Federation of Am.* stated that "full refund under an invalid order is a sound basic rule." *Id*.

[10] Circuit Mediator's Order, dated June 4, 2009, Docket Entry No. 65.

24

Several petitioners in the *IPUC* case raised arguments in their Opening Briefs that apply directly to issues of whether BPA correctly performed its Lookback Analysis and whether BPA is permitted to set off the refunds due from the IOUs for the unlawful benefits they received against future REP benefits to which the IOUs may be entitled. These issues were all addressed and decided as part of the WP-07 Supplemental rate proceeding on review in this case. Nonetheless, Preference Customers addressed the issues raised in the *IPUC* case by the IOUs and their allies in their own "Brief of Intervenor-Respondents Public Utility District Cowlitz County … *et al*." for the *IPUC* case. Preference Customers hereby incorporate their entire Intervenor-Respondent's Brief in the *IPUC* case in this brief.

The specific issues addressed in the incorporated brief are:

1. Whether the "Invalidity Clauses" included in each REP Settlement Agreement, which the IOUs claim entitles them to keep all of the excess benefits BPA conveyed to them in the REP Settlements, is severable from the REP Settlements and valid and enforceable if it truly means what the IOUs claim?

2. Whether the Invalidity Clauses have the meaning ascribed to them by the IOUs?

25

3. Whether BPA is permitted to set off the refunds due from each IOU for the unlawful benefits that IOU received against future REP Benefits to which such IOU might be entitled?

The Preference Customers demonstrate in their brief in the *IPUC* case that the Invalidity Clause does not preclude BPA from recovering the excess benefits from the IOUs and that controlling precedent in this Circuit authorizes BPA to set the refunds that the IOUs owe BPA against future REP benefits.

## CONCLUSION

The Court should not accept the various arguments advanced by the IOUs and their supporters. With these arguments, they seek to retain both the benefits to which they are entitled by law under the REP, as well as a portion of the excess benefits they received under the unlawful REP Settlement. None of these arguments warrants allowing the IOUs to retain such a windfall at the cost of the preference customers, nor do they justify the reversal of this Court's decisions in *PGE* and *GNA* that these arguments seek. The IOUs should be limited to the benefits permitted them by law under the § 5(c) REP, and should be required to return to BPA to refund to

26

the preference customers the excess benefits which the IOUs received under

the unlawful REP Settlement.

Dated:  February 25, 2010.

Respectfully submitted,

| | |
|---|---|
| /s/ Terence L. Mundorf | /s/ Mark R. Thompson |
| Terence L. Mundorf, WSB 12503 | Mark R. Thompson, OSB #04433 |
| Marsh Mundorf Pratt Sullivan + McKenzie, P.S.C. | 825 NE Multnomah Street, Ste. 1225 |
| 16504 9th Avenue SE, Ste 203 | Portland, Oregon 97232 |
| Mill Creek, WA  98012 | Tel:  503-595-9779 |
| Tel:  425-742-4545 | E-mail:  mthompson@ppcpdx.org |
| E-mail: | *Attorney for Public Power Council* |
| *Attorney for the Western Public Agencies Group* | |

| | |
|---|---|
| /s/ Paul M. Murphy | /s/ Engel E. Lee |
| Paul M. Murphy, OSB# 84125 | Peter S. Holmes, WSB 15787 |
| James L. Buchal, OSB# 92161 | Seattle City Attorney |
| MURPHY & BUCHAL, LLP | Engel E. Lee, WSB #24448 |
| 2000 SW First Ave., Suite 420 | The City of Seattle |
| Portland, Oregon  97201 | Seattle City Hall |
| Tel:  503-227-1011 | 600 Fourth Ave., Fourth Floor |
| E-mail:  pmurphy@mbllp.com | P.O. Box 94769 |
| E-mail:  jbuchal@mbllp.com | Seattle, WA  98124-4769 |
| *Attorneys for Cowlitz PUD* | *Attorneys for The City of Seattle* |

27

 /s/ Joel C. Merkel
Joel C. Merkel, WSB #4556
1001 4th Ave., Ste. 4050
Seattle, WA  98154-1119
Tel:  (206) 389-8240
E-mail:  joel@merkellaw.com
*Attorney for Northwest Requirements Utilities*

 /s/ Richard G. Lorenz
Richard G. Lorenz, OSB #003086
Thomas M. Grim, OSB #882182
Cable Huston Benedict
Haagensen & Lloyd
1001 Fifth Avenue
Suite 2000
Portland, OR  97204
Tel:  503-224-3092
E-mail:
*Attorneys for Tillamook Peoples' Utility District*

/s/ Eric L. Christensen
Eric L. Christensen, WSB #27934
Snohomish Public Utility District
2320 California Street
Everett, WA  98206
Tel:  425-783-8649
E-mail:
*Attorney for Snohomish Public Utility District*

28

## STATEMENT OF RELATED CASES

1.      *Portland General Electric Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007); *Golden Northwest Aluminum, Inc. v. Bonneville Power Admin.*, 501 F.3d 1037 (9th Cir. 2007); and *Public Utility Dist. No. 1 of Snohomish County, Wash. v. Bonneville Power Admin.*, 506 F.3d 1145 (9th Cir. 2007).  This appeal involves issues of whether, on remand, BPA corrected the legal errors identified in the above three decisions, all of which were heard and decided by the same panel consisting of Stephen Reinhart, W. Fletcher and Jay S. Bybee, Circuit Judges.

2.      *Idaho Pub. Util. Comm. et al., v. Bonneville Power Admin.,* Consolidated Docket Nos. 08-74927, 08-74928, 08-74929, 08-74932, 08-74933, 08-74942, 08-74957.  These consolidated cases may involve whether BPA is legally authorized to collect refunds of sums paid under a void contract which contains an invalidity clause.

**CERTIFICATE OF COMPLIANCE WITH RULE 32**

Certificate of Compliance with Type-Volume Limitation,

Typeface Requirements and Type Style Limitations

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,695 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.

Dated:  February 25, 2010.

Respectfully submitted,


*/s/ Terence L. Mundorf*
Terence L. Mundorf, WSB 12503
Marsh Mundorf Pratt Sullivan +
McKenzie, P.S.C.
16504 9th Avenue SE, Suite 203
Mill Creek, WA  98012

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of Intervenor-Respondents with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 25, 2010.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participant:

> David Hill
> Department of Energy
> 1000 Independence Avenue SW
> Washington, D.C.  20585

> _/s/Terence L. Mundorf_
> Terence L. Mundorf